DRAVO LIME COMPANY, INC., Appellant,

v.

Glenn EAKINS; Hon. Sheila C. Lowther, Chief Administrative Law Judge; and Workers' Compensation Board, Appellees,

Glenn Eakins, Cross–Appellant,

Dravo Lime Company, Inc; Hon. Sheila C. Lowther, Administrative Law Judge; and Workers' Compensation Board, Cross–Appellees.

Nos. 2003–SC–1027–WC, 2003–SC–1042–WC.

Supreme Court of Kentucky.

Feb. 17, 2005.

W. Barry Lewis, Francesca L. Maggard, Lewis and Lewis Law Offices, Hazard, Counsel for Appellant/Cross Appellee.

Bernard J. Blau, Jolly, Blau, Kriege & Turner, Cold Spring, Counsel for Appellee/Cross–Appellant.

## OPINION OF THE COURT

Relying on testimony from a witness who was not a practicing physician regarding the chemical properties of calcium oxide and its effects on the human body, an Administrative Law Judge (ALJ) determined that the claimant's exposure to the substance caused his pulmonary fibrosis and impairment. Furthermore, the ALJ refused to credit employer-funded disability benefits against the claimant's award. The Workers' Compensation Board (Board) affirmed on both issues. The Court of Appeals affirmed the finding of causation but reversed and remanded on the question of a credit, directing the ALJ to determine whether the disability policy provided an offset for workers' compensation benefits and to reconsider the matter of a credit in that light. KRS 342.730(6). The employer appeals the finding of causation, and the claimant cross-appeals regarding the credit.

### I. Causation

Dravo Lime Company operated a limestone mine and also processed limestone rock into lime and hydrated lime. The claimant worked at the facility for 33 years, performing a number of different jobs. He had worked as a crusher operator, conveyor man, and mechanic in the mine; screening plant operator; heavy equipment operator; and foreman. He had also worked at the lime plant and been a bagger at the hydrate plant for a number of years. His latest assignment was to

drive a truck that sprayed water to control dust throughout the facility, but he stated that he also did whatever else was needed.

The claimant testified at length regarding his exposure to limestone dust and also to dust from processed lime, indicating that he was exposed to the latter for about 30 years. He testified that because calcium oxide was highly caustic and was pulverized during processing, workers were provided with a barrier cream to help prevent the substance from coming in contact with their skin. Large quantities of vinegar were also kept on hand to neutralize it.

On March 10, 1998, the claimant worked at the lime plant, operating a backhoe under the kilns in which the rock was processed, filling trucks with lime. While doing so, he began to experience a burning sensation in his mouth, nose, and chest. He reported the symptoms to his foreman and was ordered to ride in the foreman's truck for the rest of the day. He awoke during that night, sweating and unable to breathe.

Dr. Schworer, the claimant's family physician, referred him to Dr. Griffin, a pulmonary specialist. Dr. Griffin noted the claimant's long exposure to "silica" at a limestone quarry and ordered pulmonary testing, which revealed a fairly severe restrictive lung disease that did not change after the administration of a bronchodilator. Dr. Griffin diagnosed restrictive lung disease of unknown etiology. In early May, 1998, he hospitalized the claimant for several days and performed a bronchoscopy, thorcotomy, and lung biopsy. An examination of the tissue revealed focal alveolar thickening and focal fibrosis as well as dense fibrous pleuritis with pleural adhesions. The pathologist's report also noted that chronic bronchitis, lung fibrosis, and pleural thickening were among the findings reported in patients exposed to wollastonite-limestone dusts and included a citation to an article in an environmental research journal. After reviewing the report, Dr. Griffin changed his diagnosis to chronic bronchitis, lung fibrosis, and pleural thickening due to wollastonite-limestone dust exposure. Although Dr. Griffin reported the pathologist's notation in a follow-up letter to Dr. Schworer, the letter also expressed uncertainty that exposure to limestone dust contributed to the claimant's lung disease and deferred judgment in that regard.

Following the claimant's release from the hospital, he developed a blood clot and was hospitalized again. Immediately after that hospitalization, he informed his employer of the injury and began to receive short-term disability benefits. As filed on May 3, 1999, the claimant's application for benefits alleged "White Lung" due to limestone exposure. As the evidence developed, however, he came to allege that his pulmonary impairment was due to burning and scarring of his lungs from his years of exposure to calcium oxide.

Dr. Grainger evaluated the claimant on March 17, 1999. Based upon pulmonary function studies that revealed an FVC of 43% of the predicted normal and an FEV1 of 72% of the predicted normal, he diagnosed severe restrictive pulmonary disease that accounted for a 70% AMA impairment. Having noted that the claimant "worked in the mines for 25 years," his opinion was that the condition was due to the claimant's many years of working in "mine dust." It caused him to be "100% disabled."

Dr. Powell evaluated the claimant on July 2, 1999. He noted a history of 33 years in mining at a limestone quarry, 20 years of which were spent underground and 13 years of which were spent outside at the hydrating plant. Dr. Powell reported an FVC value of 51% of the predicted normal value and an FEV1 value of 54%,

diagnosing a moderate obstructive ventilatory defect. He classified the claimant's x-rays as being category 1/1/Q/Q, consistent with occupational pneumoconiosis. He indicated, however, that results from the lung biopsy should be used to determine whether the apparent nodularity was due to silicosis, noting that the claimant's primary exposure had been to calcium carbonate, which was not known to cause nodular lung disease.

In May, 2000, Dr. Powell was asked to review a CT scan taken in April, 1998, to determine whether it evidenced pneumoconiosis "secondary to [the claimant's] exposure to limestone." Having done so, he reported finding no changes that would lead him to diagnose pneumoconiosis. When deposed on June 16, 2000, he reviewed the biopsy records. Although he agreed that the findings were abnormal and that there was some focal fibrosis, he noted that no silica was found in the tissue, making it unlikely that the changes were due to silicosis. He concluded, therefore, that the lung disease and x-ray changes were unrelated to the claimant's work.

Dr. Jarboe evaluated the claimant on July 14, 1999, and interpreted x-rays as revealing no evidence of pneumoconiosis. He obtained an FVC value of 50% and an FEV1 of 51% but reported that they were invalid due to lack of effort. When deposed on June 20, 2000, Dr. Jarboe acknowledged that the CT scan and biopsy revealed abnormalities, that there was evidence of "some nonspecific type of fibrosis," and that the claimant was suffering from restrictive lung disease. He noted, however, that the biopsy revealed no evidence of silica or the nodulation one would expect with pneumoconiosis or, more specifically, with silicosis.

The university evaluation was performed by Drs. Goldwin and Collins. Dr. Goldwin interpreted an x-ray as revealing category 1/0 scar-like opacities or atelectasis but no abnormalities that were consistent with pneumoconiosis. Dr. Collins conducted a pulmonary examination on August 11, 1999. She recorded a history of the March, 1998, incident and noted that the claimant had worked from 1960 until March 10, 1998, as a limestone miner. She obtained an FVC value of 57.3% and an FEV1 value of 58.7%, pre-bronchodilator, and an FVC value of 57.3% and an FEV1 value of 60.2%, post-bronchodilator. Based on the foregoing, she concluded that the claimant suffered from silicosis secondary to the mining and handling of limestone.

When deposed by the employer on June 30, 2000, Dr. Collins was asked to review the biopsy report. After doing so, she changed her opinion and testified that the biopsy ruled out silica dust inhalation as the cause of the fibrosis in the claimant's lungs. On cross-examination, she acknowledged that there was moisture in the lungs. She also acknowledged that the claimant had demonstrated to her what happens when lime is exposed to moisture by mixing some of it with water, probably in a specimen cup. Asked what happened, she responded that "it fumed and spewed and gassed and got hot, and almost melted the cup." The following colloquy then ensued:

Q. And that's, I think, when you discovered that there's a significant difference between lime, lime rock, and lime rock dust; did you not?

A. Yes.

Q. Does that make a difference in terms of your trying to diagnose Mr. Eakins' condition?

A. No, sir.

Q. The fact that he was inhaling lime, as opposed to rock dust, does not make a difference?

A. I'm not aware that it does, sir.

Q. The findings on the biopsy, the x-ray, and the CT scan all show fibrosis, correct?

A. Yes, sir. They did.

Q. What is fibrosis?

A. That is the deposits of fibrous tissue in response to inflammation.

Q. And Mr. Eakins described to you his inhalation of lime; correct?

A. Yes, sir.

Q. And lime, as you saw demonstrated for you by Mr. Eaklins, causes fire, or whatever you want to call it, gases, etc.; correct?

A. Well, it certainly created an exo-thermic reaction; I'll guarantee that.

Q. And to that extent, with your knowledge that there is liquid within the lung, and if Mr. Eakins had been inhaling this stuff, would this not then cause, as was described in your report, a blistering of his lung?

A. I honestly have no idea about the inhalation of small enough particles of that material when it interacted with the liquid lining the insides of the airways and the lungs.

Q Would that not be consistent with a finding of fibrosis, or scar tissue, of the lungs?

A. I certainly couldn't say it would not. Yeah.

Q. Would you agree with me that, more likely than not, that was what, in fact, is the cause of Mr. Eakins' problems?

A. I honestly don't know, sir. I certainly think it is a possible cause, sir.

Q. Would that not explain then why there's not a polarization that you keep talking about on the CT scan and on—is it more particular on the biopsy?

A. Yes, sir. If you were explaining— or if we were describing the results of injury due to this reaction in his lungs, then there very well might not be the presence of the silicates that would lead to the pneumoconiosis I originally described, and could lead to fibrosis as a consequence.

On re-direct examination, Dr. Collins responded affirmatively when asked if the scientific name for lime was calcium carbonate and indicated that she was unaware of any published papers linking the inhalation of calcium carbonate to occupational pulmonary disease. She testified that the pieces of lime the claimant showed her were approximately one centimeter in diameter, too large to be inhaled. Although she acknowledged concern that microscopic particles might produce a similar reaction inside the lungs, she stated, "I simply don't know the answer to that question." She was unfamiliar with any published research on that topic and acknowledged that the cause of pulmonary fibrosis cannot always be determined.

Testifying on the claimant's behalf, Dr. Keith Nelson stated that he obtained an undergraduate degree in chemistry and characterized his educational background in chemistry as being "fairly extensive." His curriculum vitae indicated that after premedical studies at Northern Illinois University, he had completed medical school in Zimbabwe. Dr. Nelson testified that he did not practice medicine. Instead, he had completed three years of PhD work in cellular electrobiology at the University of New Mexico and then began working in the area of public health. His present position was as a senior scientist and human health risk manager at a nuclear site in Ohio. He testified that he also worked with the Center for Disease Control, serving on the federal advisory committee regarding nuclear sites. Dr. Nelson stated that his work involved chemistry, toxicology, epidemiology, and the impacts of chemicals on human health.

As reflected in his curriculum vitae, he had completed numerous courses regarding hazardous materials.

Dr. Nelson stated that he had discussed with the claimant the nature of his work and exposure. He had reviewed Mr. Feagan's deposition as well as all of the medical reports and depositions. He stated that he did not examine the claimant, himself, because he did not practice medicine. Instead, he had relied on the findings of the physicians who did examine the claimant and on the test results. Having reviewed that information, his opinion was that the physicians misunderstood the nature of the substance to which the claimant was exposed. Dr. Nelson explained that the claimant was exposed not only to limestone rock and rock dust but also to processed limestone, which is calcium oxide. Focusing on the history of exposure to limestone dust or silica, the physicians had determined that the claimant did not suffer from pneumoconiosis. They failed to consider the impact of his calcium oxide exposure.

Referring to Mr. Feagan's testimony, Dr. Nelson explained that limestone or calcium carbonate is a naturally occurring, benign material. Like any dust, the dust from limestone rock is an irritant. When limestone is processed, it is subjected to intense heat, causing it to release carbon dioxide and produce calcium oxide or "lime," a material that is very hygroscopic and caustic. When exposed to moisture, calcium oxide creates a great deal of heat and produces calcium hydroxide, a neutral and soluble substance. Therefore, if calcium oxide comes in contact with moisture in skin or in the lining of the lungs, the heat produced by the reaction can cause tissue damage. However, the calcium hydroxide that results eventually dissolves in the body fluids, leaving no long-lasting residue that can later be detected. Calcium oxide is unstable and is considered to be a hazardous substance. Hence, the difference between an exposure to dust from lime rock and lime is significant.

Dr. Nelson testified that exposure to lime can cause first and second degree burns to the skin. When respirable particles of lime are inhaled and react with moisture, they cause irritation in the epithelial lining in the trachea and bronchi. The damage is localized, but over a period of time it becomes cumulative. In Dr. Nelson's opinion, the claimant's exposure to calcium oxide while working caused chemical burns in his lungs that accounted for the fibrosis.

The employer objected to various portions of Dr. Nelson's testimony on the ground that he was not a licensed physician. In response, Dr. Nelson emphasized that he was not testifying as a physician but as a toxicologist. He explained that his area of expertise concerned chemicals and their effects on the human body and human health. Dr. Nelson supported his testimony by introducing documents that concerned the chemical properties of limestone, calcium oxide, and calcium hydroxide; their effects on the human body; and relevant safety precautions. Among them were a Hazardous Substance Fact Sheet for calcium oxide from the New Jersey Department of Health, Material Safety Data Sheets for calcium oxide and calcium hydroxide, and the International Chemical Safety Card for calcium hydroxide from the National Institute for Occupational Safety and Health.

The burden was on the claimant to prove every element of his claim, including causation. Contrary to the employer's argument, we are convinced that substantial evidence supported the finding in the claimant's favor. Hence, it was properly affirmed on appeal. *See Special Fund v. Francis,* 708 S.W.2d 641 (Ky.1986).

As the ALJ noted when summarizing the evidence, a central issue in the claim concerned the accuracy of the exposure history that the physicians recorded and their understanding of its significance. The claimant did not allege that his impairment was due to inhaling the dust from mining limestone. He asserted that it was due to inhaling lime, or calcium oxide, the product into which limestone was processed. Nonetheless, the physicians who evaluated him attempted to determine if he suffered from silicosis or another form of pneumoconiosis due to inhaling limestone dust. They failed to consider the implications of his exposure to lime.

The ALJ observed, correctly, that there was no conflict between medical evidence that the fibrosis and resulting impairment were not caused by inhaling limestone dust and the claimant's assertion that they were caused by inhaling calcium oxide. Although Dr. Collins testified as a university evaluator, her misunderstanding of the claimant's exposure history led her to conclude that he was exposed to silica or calcium carbonate. Thus, she failed to consider the implications of his exposure to calcium oxide until she was deposed. Nonetheless, when questioned about the chemical reaction that occurred when calcium oxide came in contact with water, she agreed with the claimant's assertion that it produced heat. Furthermore, she stated that a similar reaction in the lungs could cause fibrosis. She stated, however, that she did not know if particles small enough to be inhaled would produce such a reaction.

It is undisputed that the Kentucky Rules of Evidence apply to the resolution of workers' compensation claims. The employer has cited no controlling statute or case that requires a finding of causation to be based solely on a physician's opinion or that deprives an ALJ of the authority to infer causation from properly admitted evidence. Hence, we are not convinced by the argument that the statutory definition of the term "physician" necessarily precludes an ALJ from considering other types of expert testimony if it is relevant to resolving the question of causation. *See* KRE 401 and 402. It is apparent that the facts of this claim were more complicated than those in a typical claim for occupational disease and that even the university evaluator's testimony revealed a lack of expertise regarding the nature of the risks posed by dust from the chemical to which the claimant was exposed. Under the circumstances, it was clearly within the ALJ's discretion to consider evidence from a witness who had such expertise. It was also within the ALJ's discretion to decide if Dr. Nelson was competent to testify as an expert. *Lee v. Butler,* 605 S.W.2d 20 (Ky.App.1979).

Dr. Nelson's testimony and his curriculum vitae clearly indicated that he had the education and experience to be competent to testify concerning the properties of chemicals and their effects on the human body. *See Kentucky Power Co. v. Kilbourn,* 307 S.W.2d 9, 12 (Ky.1957). No evidence in the record refuted his competence. Furthermore, the substance of Dr. Nelson's testimony regarding the effects of inhaling calcium oxide was supported by documents from government agencies whose very function is to address the risks of various materials to human health. Under the circumstances, it was not an abuse of discretion for the ALJ to consider the testimony to be competent evidence of the effects of inhaling calcium oxide.

Testimony by the claimant and Mr. Feagan provided substantial evidence to support the finding that the claimant inhaled calcium oxide over the course of his work. Dr. Collins' university evaluation

established the presence of pulmonary fibrosis and a resulting impairment, but the ALJ properly rejected the opinion that the claimant did not have an occupational disease because it was based on a flawed exposure history. Dr. Collins stated that an exothermic reaction in the lungs could cause fibrosis but did not know whether inhaling microscopic particles of lime would produce such a reaction. Dr. Nelson testified that the inhalation of calcium oxide over the course of the claimant's work caused the conditions. His opinion was based on the evidence regarding the nature of the claimant's exposure to calcium oxide, the medical evidence regarding the claimant's pulmonary fibrosis and resulting impairment, and his own expertise in toxicology. Nonetheless, he testified as a toxicologist, not as a medical expert, and the ALJ did not rely on his opinion of causation. The ALJ was explicit in basing the finding of causation on Dr. Nelson's uncontradicted testimony concerning the known effects of inhaling calcium oxide and the fact that the findings of the treating and evaluating physicians were consistent with those known effects. Under the circumstances, the finding in the claimant's favor was reasonable and was properly affirmed on appeal. See Special Fund v. Francis, supra.

## II. Credit for Short–Term Disability

The employer asserted that KRS 342.730(6) permitted it to credit the short-term disability benefits the claimant received against its liability for his workers' compensation award. Hence, it was the employer's burden to establish its entitlement. Although the Board disagreed with the ALJ's reasoning, it affirmed the decision to refuse the credit. The Court of Appeals reversed, however, and remanded the claim for a finding of whether the short-term disability plan contained an offset for workers' compensation and for a

reconsideration of the employer's right to a credit. Convinced that the Court of Appeals misinterpreted KRS 342.730(6) and that the evidence would not support a reasonable finding in the employer's favor, we reverse.

Employers commonly provide a package of private benefits in addition to statutorily-required workers' compensation benefits. Many private plans cover disability without regard to its cause, and many do not contain an offset if plan benefits duplicate workers' compensation benefits. Until December 12, 1996, no statute permitted the offset of workers' compensation benefits for private benefits that duplicated them. As a result, the courts were often asked to consider whether the payment of private benefits could be used to offset the employer's workers' compensation liability. See, for example, GAF Corporation v. Barnes, 906 S.W.2d 353 (Ky. 1995); Gatliff Coal Co. v. Evans, 896 S.W.2d 608 (Ky.1995); American Standard v. Boyd, 873 S.W.2d 822 (Ky.1994); Conkwright v. Rockwell International, 920 S.W.2d 90 (Ky.App.1996) (overruled in Williams v. Eastern Coal Corp., 952 S.W.2d 696 (Ky.1997); Eastern Coal Corp. v. Mullins, 845 S.W.2d 27 (Ky.App.1993); Beth–Elkhorn Corp. v. Lucas, 670 S.W.2d 480 (Ky.App.1983) (overruled in Williams v. Eastern Coal Corp., supra ); and South Central Bell Telephone Co. v. George, 619 S.W.2d 723 (Ky.App.1981)).

Effective December 12, 1996, the legislature enacted KRS 342.730(6) to prevent workers from receiving duplicate private disability and workers' compensation benefits. It provides as follows:

All income benefits otherwise payable pursuant to this chapter shall be offset by payments made under an exclusively employer-funded disability or sickness and accident plan which extends income benefits for the same disability covered

*by this chapter,* except where the employer-funded plan contains an internal offset provision for workers' compensation benefits which is inconsistent with this provision. (emphasis added).

It was enacted to address situations where an employer-funded plan permits benefits without regard to the cause of the recipient's disability and fails to contain an offset for workers' compensation benefits. Shortly after KRS 342.730(6) was enacted, the court determined in *Williams v. Eastern Coal Corp., supra,* that private benefits for a pre-December 12, 1996, injury could not be applied to reduce an employer's workers' compensation liability absent statutory authorization.

The short-term disability plan that is at issue was part of a package of benefits the employer provided through an insurance contract. It is undisputed that the weekly indemnity benefit (short-term disability) was employer-funded. The schedule of benefits and plan documents that were introduced during Mr. Feagan's deposition indicate, among other things, that disability benefits are payable for up to 26 weeks and that the carrier has the right to recover any excess payment. They do not state that plan benefits are offset by workers' compensation benefits; however, they state, explicitly, that the plan does not cover disability "for an injury or sickness due to employment with any employer." It is apparent, therefore, that because the plan does not extend income benefits for a disability that is covered by Chapter 342, it is not the type of plan for which KRS 342.730(6) provides an offset. Therefore, no offset is permitted on these facts.

This is not the type of case in which the claimant's ultimate recovery will necessarily be greater than Chapter 342 requires. He received the private benefits under a plan that did not cover work-related disability. It was later determined that his disability was work-related. Therefore, both the explicit terms of the insurance contract and the law of Kentucky entitle the carrier to recover the private benefits that it paid under a mistaken belief that the claimant's injury was not work-related. *See Riverside Insurance Company v. McDowell,* 576 S.W.2d 268 (Ky.App.1979). Assuming that happens, there will be no double recovery.

The decision of the Court of Appeals is affirmed in part and reversed in part, and the award is reinstated as it was rendered.

All concur.